**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 28, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP544**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019TP194

**IN COURT OF APPEALS
DISTRICT I**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO B.P., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

A. T.,

      RESPONDENT-APPELLANT.

      APPEAL from an order of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1 WHITE, J.[1] A.T. appeals the order terminating his parental rights to his son, B.P. A.T. argues that the circuit court erroneously exercised its discretion when it found him an unfit parent because there was insufficient evidence to prove he failed to assume parental responsibility for B.P. Further, he asserts that the circuit court erroneously weighed the statutory factors when it concluded that termination was in the best interests of the child. We reject A.T.'s arguments and affirm.

## BACKGROUND

¶2 B.P. was born in March 2018. He was found to be a child in need of protection of services (CHIPS) and placed with Division of Milwaukee Children Protective Services (DMCPS) approved foster parents who were already caring for two of his older siblings. In October 2019, the State filed a petition to terminate parental rights to B.P. for both his mother and his then-unknown father. In April 2021, A.T. was served with the summons and petition to terminate his parental rights to B.P. as his possible father. In May 2021, A.T.'s paternity was confirmed by DNA testing. In June 2021, A.T.'s TPR case was severed from A.P.'s TPR case.[2]

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] A.P.'s parental rights to B.P., and two older children from another father, were terminated in June 2021. She appealed and this court reversed and remanded for further proceedings. *See State v. A.P.*, Nos. 2022AP95, 2022AP96, and 2022AP97, unpublished slip ops. (WI App Apr. 26, 2022). A.P.'s case was decided by the Honorable Ellen R. Brostrom. A.T. successfully requested a substitution of judge, and this case was decided by the Honorable Marshall B. Murray, whom we refer to as the circuit court in this opinion. The remand of A.P.'s case has no bearing on A.T.'s case.

¶3 In July 2021, A.T. entered a plea contesting the TPR, which alleged a failure to assume parental responsibility for B.P. A.T. waived his right to a jury trial and requested a court trial, which was then held over three days in October 2021. At trial, the court began with the grounds for the TPR and the State first called A.T. A.T. testified that he had been convicted of four crimes, including the conviction for which he was incarcerated shortly after B.P.'s conception through the time of the trial. He and A.P. met and had sex without discussing or using any methods of birth control. He was a childhood friend of B.V., the father of A.P.'s older children. After their sexual encounter, he did not make any attempts to reach out to A.P., B.V., or any mutual contacts, nor did he file a declaration of paternal interest. A.T. testified that he did not provide daily supervision, education, or child support for B.P. after he was born. He stated that after he received the TPR petition he did not reach out to the case manager because he was not given her contact information. He did not send letters to DMCPS seeking information about B.P. He stated he did not know he could do so.

¶4 Next, the State called a supervisor for Children's Wisconsin family case managers. The supervisor worked with A.P., B.V., and the three children in DMCPS placements throughout this case. She explained that B.P. had been in the newborn intensive care unit from his birth in March 2018 until June 2018, when he was placed in foster care. A.P. initially named B.V. as B.P.'s father, but after DNA testing showed he was not the father, A.P. was asked about other possible fathers.

¶5 The supervisor testified that A.T.'s parents reached out in July 2021 and requested visitation and placement, expressing to her that "they had a right to have him immediately and that [DMCPS] were violating their rights by not bringing him to them." Although the supervisor explained that B.P had been in

the care of this foster placement for three years, since he was three months old, he was well-bonded to his foster parents, and he was placed with his siblings, A.T.'s parents did not think that those issues were factors and they should have immediate placement regardless. She explained that the grandparents gave their information to the case manager to do a background check, but they declined to schedule a home visit on two occasions. In September 2021, the supervisor sent the grandparents a letter outlining the discussions about B.P., the progression of the case, and the necessity of having a home visit in order to arrange visitation.

¶6       The State then called the family case manager, who testified that she had been working with the family since 2018. She testified that A.P. had been asked about probable fathers for B.P. on multiple occasions and that she offered a first name in 2019 and that man's full name in 2020. He was excluded as the father in DNA testing. She checked the state records and found no declaration of paternal interest documents filed. She explained that A.P. offered A.T.'s name as a possible father in March 2021.

¶7       The case manager testified that she exchanged letters with A.T. in June and July and received his consent to release information to his parents. She stated that A.T. did not ask for visitation for himself and did not ask any questions about B.P. or his welfare. The case manager spoke with the grandparents four or five times, and on multiple occasions the grandparents stated that B.P. should not be in foster care, but with his blood relations, and they were dismissive of the consequences of separation from his siblings and the only home he's ever known.

¶8       A.T.'s counsel called A.T., who testified that he was made aware in May 2021 that A.P. named him as a possible father of B.P. When he found out, he immediately sought grandparents' rights for his parents so they could take custody

and he could have contact with B.P. through them. He did not ask for visitation rights for himself while he was in prison, because he was unaware that was possible. He did not know of any efforts by DMCPS or the case manager to contact the prison directly. A.T. testified that he did not ask after B.P.'s health because he was unaware there were issues. No one told him he could ask questions about B.P. He spoke to his parents extensively about them pursuing custody as grandparents.

¶9 A.T.'s counsel then called his father, D.T. He testified that he became aware that A.T. could be the father of B.P. in May 2021. After having the DNA test confirm A.T.'s paternity on June 2, 2021, D.T. called social services and Children's Wisconsin to try to find out about his grandson. He stated that he and his wife gave information for a background check, but no visitation was ever set up. During cross-examination, D.T. testified that he had a pleasant conversation with the supervisor, but he did not trust the case manager and he did not recall declining a home visit except for a death in the family. He testified that he did not ask about B.P.'s health or medical situation. He did not ask about education or services the child needed.

¶10 After closing arguments, the circuit court issued an oral ruling on the grounds phase of the TPR proceedings, based on the allegation of failure to assume parental responsibility under WIS. STAT. § 48.415(6). The court explained that the State argued that the evidence and A.T.'s testimony showed that he did not demonstrate that he had any interest in knowing whether or not he had a child and he did not provide for the child before or after birth. The evidence showed that A.T. was incarcerated throughout many parts of this case, but "incarceration of a parent does not mean itself or establish a failure to assume parental responsibility[.]"

¶11    The circuit court stated that "there has never been a substantial parental relationship" for A.T. with B.P.  Referencing the relevant jury instructions, an incarcerated parent can establish parental responsibility by offering to pay child support.  The court found that A.T. did not offer and did not provide support for B.P.  An incarcerated parent can show responsibility by requesting visitation, which A.T. did not do.  The court found there was no evidence that A.T. asked to communicate with the caregivers.  A.T. did not request information about the child's "education, health, welfare."  The court concluded that A.T. asking his parents to pursue visitation and contact with B.P. did not show that A.T. assumed or intended to assume parental responsibility.

¶12    The court concluded it was satisfied by clear and convincing evidence that the State has proven the TPR ground of failure to assume parental responsibility.  The court stated that from the time A.T. was happy to learn he might be a father in February 2021 through July 2021 when he substituted judges, "that was more than enough time for [him] to be able to, if [he] wanted, to assume parental responsibility."  The court then found A.T. to be unfit.

¶13    The trial then proceeded to the dispositional phase to determine whether TPR would be in B.P.'s best interests.  The State called the case manager, who testified that B.P. was three years old, had been with his foster parents since he was about three months old, and they were an adoptive resource for him.  His foster parents were licensed and approved to adopt; they were also the placement for B.P.'s half siblings.  B.P. called his foster parents "mom and dad" and he was well-bonded to his siblings.

¶14    During cross-examination, A.T.'s attorney asked if the foster parents were prepared to raise B.P. within his culture and Hispanic heritage.  The case

manager stated that the foster parents have discussed this and they want B.P. and his siblings to know their culture.[3]

¶15    A.T.'s counsel recalled him to the stand.  He testified that it was not in B.P.'s best interests to be adopted by his foster parents because he is A.T.'s son. He stated that the foster parents cannot be able to prepare him to be a young Hispanic man because they are white and not Hispanic.  He stated that B.P. should interact with and get to know A.T.'s parents and his cousins.

¶16    In closing arguments, A.T.'s counsel addressed that the court may consider any other factor in addition to the six required statutory considerations under WIS. STAT. § 48.426(3).[4]  Counsel argued that B.P. needed "the kind of

---

[3] We note here that the record reflects that A.P., the foster parents, and B.P.'s half siblings are white.

[4] When determining whether a TPR is in a child's best interests, the circuit court "shall consider," but is not limited to, the following six factors:

> (a)  The likelihood of the child's adoption after termination.
>
> (b)  The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c)  Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d)  The wishes of the child.
>
> (e)  The duration of the separation of the parent from the child.
>
> (f)  Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

Sec. 48.426(3).

preparation to go into the world as a Hispanic child and need to have a grasp on the culture." She argued that there was no evidence that the foster parents could assist B.P. with what he needs to know about his culture and heritage.

¶17    On the final day of trial, the court reviewed the considerations of whether the TPR would be in B.P.'s best interests. Addressing the six factors, the court concluded that they weighed in favor of termination.

> The [foster parents] are licensed, willing and committed to adopting [B.P.]. There is nothing about the age or health of the child that would be a barrier to the adoption. He is three years old, about three-and-a-half years old. He has been outside of the parent's home since he was three months old right from the hospital to the caregiver's home and it is the only home he has known.
>
> He does not have a substantial parental relationship with either the mother or the father and that was born out in the testimony during the jurisdictional phase of these proceedings. He doesn't have a substantial parental relationship with other family members other than his siblings.
>
> ….
>
> I believe it would not be harmful to the child to sever those legal relationships that he has with his father and the paternal family members.
>
> ….
>
> The wishes of the child. The child is too young to say what his wishes are. The duration of separation on the part at least of the father has been the past three years and they have not met each other and I find that the child would be able to enter into a more stable and permanent family relationship as a result of the termination taking into account the current conditions and the fact he has been placed there for three years and is the only home he has known. If the TPR is not granted, I find that the child would languish in foster care[.].

¶18    The court then addressed A.T.'s argument about the issue of culture and A.T.'s father's statement that "blood should outweigh all of those other factors."

> Culture really shows up in conversations when we are talking about race …. I can't accept the fact that culture outweighs the other factors because stereotypes are brought into that and stereotypes are assigned because of the color of their skin and not because who they are or what they are about or that they have done with their lives[.]

The court found that the State has proven that termination is the best interests of B.P. by clear and convincing and satisfactory evidence.

¶19    This appeal follows.

## DISCUSSION

¶20    A.T. argues that the circuit court erroneously exercised its discretion when it found that A.T. was an unfit parent because there was insufficient evidence as a matter of law to support the circuit court's conclusion that A.T. failed to assume parental responsibility.  Second, he argues the circuit court erroneously exercised its discretion when it concluded that termination was in B.P.'s best interests.

¶21    The decision to terminate parental rights is within the discretion of the circuit court.  *See **Gerald O. v. Susan R.,*** 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996).  We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion.  WIS. STAT. § 805.17(2).  A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process

9

reaches a conclusion that a reasonable judge could reach. ***Dane County DHS v. Mable K.***, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198.

## I. *Unfitness ground: failure to assume parental responsibility*

¶22 A.T. argues that there was insufficient evidence to support that he failed to assume parental responsibility for B.P. as grounds for his parental unfitness. "Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict." ***St. Croix Cnty. DHHS v. Michael D.***, 2016 WI 35, ¶29, 368 Wis. 2d 170, 880 N.W.2d 107. We review the evidence in the light most favorable to the verdict. ***Tammy W-G. v. Jacob T.***, 2011 WI 30, ¶39, 333 Wis. 2d 273, 797 N.W.2d 854. Whether the evidence was sufficient is a question of a law we review independently. ***Id.***, ¶17. In a trial to the court, its findings of fact shall not be set aside unless clearly erroneous. WIS. STAT. § 805.17(2).

¶23 Failure to assume parental responsibility as a ground for a TPR action is established when the State proves that the parent does not have a substantial parental relationship with the child. *See* WIS. STAT. § 48.415(6)(a). In this context, a "'substantial parental relationship' means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). The factors the court considers includes expressing concern for the "support, care or well-being of the child" and, for putative fathers, whether the person expressed concern for the "support, care, or well-being of the mother during her pregnancy." ***Id.***

¶24 Although A.T. acknowledges that the court applied the correct law, he contends the court's fact-finding was clearly erroneous. His arguments do not dispute the substance of the State's evidence to support his failure to assume

parental responsibility. He argues that he acted as soon as he learned that he could be B.P.'s father. A.T. asserts that the case managers and DMCPS failed to inform him about his parental rights. He asserts that he did not know he could ask for visitation while incarcerated. None of A.T.'s arguments show that the evidence was insufficient to support the findings on the ground of failure to assume parental responsibility.

¶25 The evidence, viewed in the light most favorable to the court's finding, supports the circuit court's finding that A.T. failed to assume parental responsibility for B.P.[5] We conclude that the circuit court's fact finding was not clearly erroneous. A.T. did not attempt to discover whether A.P. got pregnant as a result of their unprotected sexual encounter. A.T. did not pay or offer to pay child support for B.P. before or after he was born. A.T. did not request visitation for himself. He did not ask about B.P.'s "education, health, welfare." He did not exercise any responsibility for B.P.'s daily supervision, education, or care. Based upon the totality of the circumstances, there is sufficient evidence to support the circuit court's finding that A.T. failed to assume parental responsibility for B.P. at anytime before or after establishing his legal relationship as the father; and therefore, A.T. is unfit.

---

[5] A.T. additionally argues that his actions to get grandparents' rights for his parents shows his intent to assume parental responsibility. This statutory ground looks at the parent's actions to assume parental responsibility. *See* WIS. STAT. § 48.415(6). While we respect family support for parents, he has failed to show that pursuing grandparents' rights demonstrated his intent to satisfy any of the considerations under WIS. STAT. § 48.415(6). Additionally, he provides no legal authority that the circuit court should have imputed his parents' actions toward his individual responsibility. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

## II. *Best interests of the child*

¶26 A.T. argues that the circuit court erroneously exercised its discretion when it determined that the TPR was in the best interests of B.P. during the dispositional phase of the proceedings. During the dispositional hearing, the circuit court should consider all relevant evidence "including any factors favorable to the parent," and must consider at minimum the six statutory factors under WIS. STAT. § 48.426(3). *Steven V. v. Kelley H.,* 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856. We defer to the circuit court's determination of the proper weight of each factor when the court properly examined each factor on the record. *State v. Margaret H.*, 2000 WI 42, ¶29, 234 Wis. 2d 606, 610 N.W.2d 475.

¶27 A.T. acknowledges that the circuit court considered all six factors; however, he argues that the court's weighing was erroneous.[6] Particularly he takes issue with the court's consideration of the third factor: whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships. WIS. STAT. § 48.426(3)(c). He contends that it is not in B.P.'s best interest to be adopted because B.P. is his biological child and they share Hispanic heritage and culture. He asserts that there was no evidence presented that the foster parents as an adoptive resource were prepared to raise B.P. as a Hispanic man. He argues that it would be in B.P.'s best interests to get to know and be able to interact with his father, grandparents, and extended family.

---

[6] A.T. appears to object to the court's weighing of all six factors with a general position that the factors do not fully support termination. The factors do not need to all fully support termination for the circuit court to still properly exercise its discretion in ordering the TPR. We decline to develop arguments for A.T. as "[w]e cannot serve as both advocate and judge." *See Pettit*, 171 Wis. 2d at 647.

¶28 A.T.'s arguments about the third factor appear to misunderstand this consideration. A.T. contends that B.P. should get to know his paternal family—the third factor asks the court to consider whether a substantial relationship exists between the child and the child's parents or any part of the child's extended family. Here, there is no relationship between B.P. and his father or paternal family. Further, a shared cultural or racial heritage does not by itself create a substantial relationship. If it did, any familial relationship would be substantial, and the use of the word would be surplusage—a result we avoid when discerning the meaning of statutes. *See **State ex rel. Kalal v. Circuit Ct. for Dane Cnty.**,* 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶29 Moreover, the third factor asks the court to determine the harm to the child if that substantial familial relationship is severed. A.T.'s arguments are based on potential relationships with his father and paternal family. Harms from severing an unformed relationship are not contemplated by this factor. A.T. additionally argues that B.P. would be harmed by the loss of the connection to his Hispanic cultural heritage. Wisconsin law does not require courts to consider race or culture when determining whether to terminate parental rights, and A.T. cites no authority holding there is such an obligation. *See **State v. Pettit**,* 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶30 Here, the record reflects that the circuit court appropriately considered on the record all six factors under WIS. STAT. § 48.426(3) as well as A.T.'s culture argument. It ultimately concluded that the TPR would be in B.P.'s best interests and that if it were not granted, the child "would languish in foster care." It considered the cultural issue, but concluded that it did not outweigh the factors in support of termination. The circuit court considered the relevant facts and evidence presented. It applied the proper standard of law. It demonstrated

rational decision-making in its analysis of the factors. We discern no error in its discretion to terminate A.T.'s parental rights.

**CONCLUSION**

¶31     For the reasons stated above, we affirm the order terminating A.T.'s parental rights to B.P.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.